UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FARANAK PAHLEVANI, PH.D., | |
| Plaintiff, | CIVIL ACTION NO. 3:23-cv-01189 |
| v. | (SAPORITO, J.) |
| THE PENNSYLVANIA STATE UNIVERSITY | |
| Defendant. | |

## MEMORANDUM

This is an employment discrimination action. The plaintiff, Faranak Pahlevani, Ph.D., is a female mathematics professor employed by The Pennsylvania State University ("Penn State"). The main campus of the defendant, her employer, Penn State, is located in Centre County, Pennsylvania. Dr. Pahlevani teaches at Penn State Abington, a branch campus of Penn State located in Montgomery County, Pennsylvania. Dr. Pahlevani was born in Iran, and she is of the Middle-Eastern Iranian race.

Dr. Pahlevani has brought claims of workplace sex, race, and national origin discrimination. In her complaint, she alleges that, over the course of several years, beginning in May 2016 and continuing until

the present, she was paid less than an American-born Caucasian male colleague, Matthew A. Fury, Ph.D., despite their work requiring equal skill, effort, and responsibilities. Her four-count complaint asserts a racial discrimination claim under the Civil Rights Act of 1866, 42 U.S.C. § 1981, sex, race, and national origin discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, a sex discrimination claim under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and a sex discrimination claim under the Equal Pay Act of 1963, 29 U.S.C. § 206(d). For relief, she seeks an award of damages.

Her employer has moved for summary judgment. Doc. 40. That motion is fully briefed and ripe for decision. Doc. 45 (sealed); Doc. 52 (sealed); Doc. 56 (sealed).

## I.   LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A

dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a prima facie showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that prima facie showing has been made does the

burden shift to the non-moving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a *form* which is inadmissible at trial, the *content* of the evidence must be capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

## II.  MATERIAL FACTS[1]

Dr. Pahlevani was initially offered a tenure-track position as an

---

[1] In compliance with Local Rule 56.1, the defendant's motion for partial summary judgment is "accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried," Doc. 42-2 (sealed). M.D. Pa. L.R. 56.1. Moreover, each factual statement presented by the defendants in support of their respective motions for summary judgment "include[s] references to the parts of the record that support the statements." *Id.*; *see also* Fed. R. Civ. P. 56(c)(1).

A party opposing summary judgment is likewise required by the local rules to file "a separate, short and concise statement of the material facts, responding to the numbered paragraphs" in the movant's statement of material facts, which must similarly "include references to the parts of the record that support the statements." M.D. Pa. L.R. 56.1.

Here, the non-moving plaintiff has filed the requisite responsive statement of material facts, responding to the numbered paragraphs of the moving defendant's statement of material facts. Doc. 51 (sealed) ¶¶ 1–310. But in addition to her responsive statement of material facts, the plaintiff has also filed a separate "counter-statement of material facts" that does not respond to the defendant's statement of material facts. *Id.* ¶¶ 311–91. The local rules do not permit a non-moving party to file an *additional* statement of material facts that does not respond to the movant's statement. *See Farmer v. Decker*, 353 F. Supp. 3d 342, 347 n.1 (M.D. Pa. 2018) (disregarding non-movant's additional statement of facts for non-compliance with Local Rule 56.1); *Barber v. Subway*, 131 F. Supp. 3d 321, 322 n.1 (M.D. Pa. 2015) (declining to consider separate counter-statement of facts that was non-responsive to the movant's statement because it was "neither contemplated nor permitted by the Local Rules"); *see also Rau v. Allstate Fire & Cas. Ins. Co.*, 793 Fed. App'x 84, 87 (3d Cir. 2019) (upholding district court decision to strike non-movant's non-responsive counter-statement of facts under Local Rule 56.1); *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613–14 (3d Cir. 2018) (upholding district court decision to strike non-responsive paragraphs from non-

*(continued on next page)*

Assistant Professor of Mathematics at Penn State Abington in January 2010, with an August 2010, fall semester, start date. She had prior experience teaching at Ramapo College of New Jersey and Medgar Evers College before she was hired to be an Assistant Professor at Penn State Abington.

Dr. Pahlevani received the offer to work as an Assistant Professor of Mathematics at Penn State Abington from then-Chancellor and Dean of Penn State Abington, Karen Wiley Sandler, who offered Pahlevani a starting salary of $55,008 per year.

Shortly after Dr. Pahlevani received her job offer, Chancellor Sandler also issued a job offer to Matthew Fury, Ph.D., a male, to begin working as a tenure-track Assistant Professor of Mathematics, to begin in the fall semester, beginning in August 2010. Dr. Fury obtained his Ph.D. in Mathematics in the spring of 2010. Chancellor Sandler offered Dr. Fury a starting salary of $52,506 per year.

Dr. Pahlevani and Dr. Fury began their work as tenure-track Assistant Professors in the Math Department at Penn State Abington at

---

movant's answer to movant's statement of material facts under Local Rule 56.1). Thus, we have simply disregarded the plaintiff's non-responsive additional "counter-statement of material facts."

the same time, in the fall semester, beginning in August 2010. At the outset, Dr. Pahlevani was paid a starting salary $2,502 higher than Dr. Fury's starting salary. Both were paid monthly by Penn State on or about the last day of each month.

One year prior to hiring Dr. Pahlevani and Dr. Fury, Penn State Abington hired Michael Tepper, Ph.D., a male, to work as an Assistant Professor of Mathematics. Dr. Tepper had prior experience teaching at Temple University and Baruch College (part of the City University of New York) before he was hired as an Assistant Professor at Penn State Abington. Penn State Abington offered Dr. Tepper a starting salary of $55,008 per year.

Penn State Abington Professors of Mathematics, including the plaintiff, are directly supervised by Penn State Abington's Science and Engineering Division Head. Division Heads serve as something like a department chair or an academic dean. They are responsible for leadership around academic affairs, including development of schedules for academic programming, ensuring student success within their units, and working through the annual faculty performance review and promotion and tenure processes. Although a Division Head may engage

in teaching a class, they are mostly released from teaching to engage in leadership and administration, and they are paid different, higher salaries than faculty.[2]

At the time of Dr. Pahlevani's initial hire, that official was Leah Devlin, a woman. At some time prior to January 2014, Dr. Devlin was succeeded in that position by Ann Schmiedekamp, also a woman. In October or November 2015, Dr. Shmiedekamp was succeeded in that position by Zafer Hatahet, a Middle Eastern man born in Syria.

Beginning on August 16, 2021, Dr. Fury, a Caucasian male, became Penn State Abington's Interim Science and Engineering Division Head, succeeding Dr. Hetahet. He was then hired and served as the permanent Science and Engineering Division Head from July 1, 2022, until the end of June 2024. Once permanently appointed as Division Head, Dr. Fury was paid $145,008. The last time Dr. Fury taught a full schedule of classes as a faculty member was Spring 2021.

---

[2] The non-moving plaintiff's response indicates that she disputes this factual statement, but her answer to this fact statement is non-responsive, stating only that such administrators receive a base salary and supplemental compensation for administrative duties, citing a letter-agreement confirming the terms of Dr. Fury's appointment as Interim Division Head in August 2021. Thus, the moving defendant's statement of fact is deemed admitted.

The current Science and Engineering Division Head is Judith Ozment, a woman.

Within the various Divisions at Penn State Abington, there are also Program Chairs, who are tasked with being the connection between faculty and Division Heads, scheduling classes, providing faculty with professional development, and generally providing information to faculty within a particular department. Dr. Tepper has been Chair of the Mathematics Program at Penn State Abington from 2015 to present. In that role, Dr. Tepper has never been Dr. Pahlevani's direct supervisor, but he has been tasked with providing management and administrative support for the Math Department and its faculty. Program Chairs engage in teaching but are frequently compensated through a combination of course reassignments and stipend for work performed, which is determined through negotiation with their respective Division Heads.

Chancellor Sandler served as Chancellor and Dean of Penn State Abington between 1994 and July 1, 2016. Between June 2016 and July 2020, Dr. Damian Fernandez, a Cuban-born man, served as Chancellor of Penn State Abington. Dr. Margo Dellicarpini became Chancellor in late 2020 or early 2021.

Between 2016 and 2024, Dr. Andrew August served as Vice Chancellor for Academic Affairs, in which role he served as Chief Academic Officer and was responsible for overseeing all of the academic activities of Penn State Abington. He remains currently employed as a Professor of History at Penn State Abington.

At the end of June or beginning of July 2024, Dr. Fury was promoted to work as Penn State Abington's Interim Vice Chancellor for Academic Affairs, succeeding Dr. August in the role. As Interim Vice Chancellor, Dr. Fury oversaw three Division Heads and directly supervised Penn State Abington's Student Success Coordinator, Global Programs Director, Advising Manager, and the Coordinator for the Vice Chancellor. He also oversaw promotion and tenure reviews and sabbatical applications, and he was considered the Chief Academic Officer and the Chief Director of Undergraduate Education Policy, reporting directly to the Chancellor and Dean. As Interim Vice Chancellor, Dr. Fury no longer taught any classes.

Throughout Dr. Pahlevani's tenure at Penn State Abington, Daniel Meuleners worked as Penn State Abington's Financial Officer; he has worked for Penn State Abington for approximately thirty years.

Between 2016 and 2022, Lisa Marranzini worked as a Regional HR Strategic Partner for Penn State. Ms. Marranzini oversaw operations at Penn State Abington as part of her Regional HR Strategic Partner role from 2016 to 2022. In 2023, Ms. Marranzini began reporting to Penn State's University Park campus as the Assistant Vice President for Administration and Chief of Staff for Penn State's Commonwealth Campuses.[3]

Penn State has a policy, *AD91 Discrimination and Harassment and Related Inappropriate Conduct*, which prohibits discrimination and harassment in all forms, as well as retaliation related to reports of such conduct.[4] The policy specifically prohibits discrimination or harassment

---

[3] Penn State Abington is one of twenty Penn State branch campuses across the state.

[4] The non-moving plaintiff's response indicates that she disputes this factual statement, but in support, she cites only to her own counter-statement of facts *generally*. Thus, this statement of material fact by the moving defendant is deemed admitted. *See Oxford Invs., L.P. v. City of Phila.*, 21 F. Supp. 3d 442, 448 (E.D. Pa. 2014) ("The party opposing summary judgment must cite specific evidence in the record and may not[] 'rest solely on assertions made in the pleadings, legal memoranda, or oral argument.'"); *see also Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006) ("Judges are not like pigs, hunting for truffles buried in the record.") (internal quotation marks omitted); *Francis ex rel. Estate of Francis v. Northumberland Cnty.*, 636 F. Supp. 2d 368, 399 (M.D. Pa. 2009) ("[I]t is not the Court's responsibility to dredge through the record evidence to find questions of material fact.").

against any person because of their actual or perceived race, national origin, sex, or gender.[5] This policy is a companion to another policy, AD85, which states Penn State's policy against discrimination and harassment under Title IX.[6] Dr. Pahlevani, Dr. Fury, Dr. Tepper, Dr. Hetahet, Chancellor Sandler, Chancellor Fernandez, Chancellor Dellicarpini, Dr. August, Mr. Meuleners, and Ms. Marranzini each received annual ethics and compliance training.[7]

Penn State Abington's professors undergo annual performance reviews. Those who have been hired into tenure eligible positions (i.e., tenure track) undergo promotion and tenure reviews ("P&T reviews") in or around their second, fourth, and sixth years of employment. They are not subject to an annual performance review during these P&T review

---

[5] *See supra* note 4.

[6] *See supra* note 4.

[7] The plaintiff does not dispute that she received this training. She contends that the evidence cited by the moving defendant does not support the defendant's statements that others received this training as well, but we note that the cited materials include certificates of training for multiple faculty members, including Pahlevani, Fury, Tepper, and others. Dr. Pahlevani also disputes the defendant's additional characterization of this training in its statement of material facts, albeit without citing any evidence to the contrary. *See supra* note 4. We have nevertheless disregarded this additional characterization as it is immaterial to our decision.

years. Tenure-track professors may be promoted from Assistant Professor to Associate Professor, and then from Associate Professor to Full Professor.

During annual performance reviews, a professor's performance is assessed across three categories: (a) teaching; (b) research; and (c) service.[8] To prepare for the annual performance review process, professors must compile and submit a Faculty Activity Report ("FAR") detailing their teaching, research, and service activities. A professor's FAR serves as the basis for his or her annual performance review and impacts what, if any, merit increase he or she may receive to his or her salary following that review.[9] Each professor is responsible for putting the FAR together for submission to his or her Division Head.

In the first year of her employment at Penn State Abington, Dr. Pahlevani prepared her FAR to contain information about her teaching,

---

[8] The non-moving plaintiff's response indicates that she disputes this factual statement, but in support, she cites to certain paragraphs of her non-responsive counter-statement of material facts, which provide her own characterization of the annual performance review process as "subjective and general in nature," but they do not contradict this particular statement of fact by the moving defendant. Thus, the moving defendant's statement is deemed admitted.

[9] *See supra* note 8.

research, and service activities. After her first year, she used a University-provided template to complete her FAR, in which a faculty member could input information about his or her teaching, research, and service under these categories and titles in the template document. In this template, data was partially automated into the document, including numerical teaching ratings from students, and any grants the faculty member has through Penn State or which had been historically recorded by Penn State. It was incumbent upon the faculty member to include in the FAR as much as he or she would like to share with their Division Head, and then the faculty member would generate a final Microsoft Word or PDF version of the FAR to send to the Division Head when completed.

It was explained to all faculty in the Math Department by the Division Heads for Science and Engineering that it was important to complete the FAR and that each faculty member should highlight his or her accomplishments in teaching, research, and service over the preceding year to be submitted for annual performance review. Preparing the FAR and submitting it is significant.

As part of the annual evaluation of a professor's teaching, the FAR

includes student evaluations of teaching ("SRTEs"). Students are asked to rate their course and instructor on a scale from one to seven, with one being low or poor, and seven being very high. Students can also provide open-ended comments as part of their evaluations.

Dr. Pahlevani was aware of the existence of student evaluations being part of her annual review, and she was informed of the specific scores given to her by the students over the years because she needed to include this information in her FAR.

The majority of Division Heads at Penn State Abington have been professors themselves, and any student comment about a professor's accent or the professor speaking English as a second language is not counted against the faculty member in the annual evaluation.[10] Division Heads also independently verify any negative student comments to determine their veracity.[11] At his deposition, Dr. Hatahet testified that,

---

[10] The non-moving plaintiff's response indicates that she disputes this factual statement, but her answer to this fact statement is non-responsive, stating only that she was informed by Vice Chancellor August on October 25, 2021, that the student evaluation portion of the annual review process had been changed from "counting mean to median and the mode" because minority faculty members were receiving low evaluation scores. Thus, the moving defendant's statement is deemed admitted.

[11] *See supra* note 10.

as Division Head, he never saw a student display hostility toward a faculty member who spoke with an accent, and he had never heard a student complain about a professor's accent.

Student evaluations are considered indicators of good teaching; however, the variety of courses and development of new courses by a professor are also factors considered in the annual evaluations.[12] Part of the teaching evaluation for the annual review also includes a once-a-year observation of a professor's classroom teaching by his or her Division Head or a designee.[13]

In their FAR, professors are also asked to report on their research, which can include juried or peer-reviewed articles, or something presented at a conference.

The service component of the annual evaluation requires information in the FAR about a professor's service in the community, to the University, to the department, and to the discipline in which the professor works.

Once a professor's FAR has been submitted, it is reviewed by the

---

[12] *See supra* note 10.
[13] *See supra* note 8.

Division Head with supervisory authority over the professor's department. Professors are then afforded an opportunity to voluntarily meet with their Division Head to review and discuss the FAR as part of the annual review process. During these optional meetings with the Division Head, professors are able to review the scoring rubric, to discuss any necessary updates, improvements, or clarifications regarding their teaching, research, or service, and to discuss their goals going forward. The goal of the in-person meetings with the Science and Engineering Division Head was for the professor to go over each category of teaching, research, and service and to explain in more detail what was done in the preceding academic year.

After this in-person meeting, the Science and Engineering Division Head would submit a final letter with scores to the Chancellor.[14] Based on the information contained in a professor's FAR, as well as any additional information obtained from the professor during the voluntary meeting with his or her Division Head, the Division Head would assign a numerical score to each of the areas of teaching, research, and service,

---

[14] *See supra* note 8.

ranging from 1 for "poor" to 5 for "excellent."[15] On this scale, a score of 3 is designated as "good," but it is really a score of "average."[16]

Evaluators objectively consider performance indicators when assigning professors' categorical scores.[17] Overall annual performance review scores for professors are calculated by taking a weighted average of each professor's teaching, research, and service scores, typically weighted at 60% for teaching, and 20% each for research and service.[18]

Since Penn State Abington adopted a human resources information management system called "Workday" in 2018 or 2019, at the end of the annual performance evaluation process, a professor can check a box indicating that he or she is not happy with their evaluation to escalate the issue.[19] While Dr. Fury served as Dr. Pahlevani's Division Head, she never complained to him that she was displeased with the scores she received on her evaluations. To date, Dr. Pahlevani has never complained about or appealed any of the performance scores issued to her by any of

---

[15] *See supra* note 8.
[16] *See supra* note 8.
[17] *See supra* note 8.
[18] *See supra* note 8.
[19] *See supra* note 8.

her Division Heads.[20]

In advance of their second, fourth, and sixth year P&T reviews, professors must provide an overall statement of their activities up to that time in terms of all areas of teaching, research, and service—referred to as the professor's "dossier." The criteria upon which promotion and tenure decisions are based include teaching, research, and service, which are applied in light of the mission of the academic unit and the professional responsibilities carried by the professor. P&T reviews are far more extensive than annual performance reviews, and they include several levels of review by various committees. The P&T review committees also evaluate professor performance in teaching, research, and service using the same five-point scale Penn State Abington uses for annual performance reviews.

The results of a professor's P&T review are shared with the professor seeking promotion. Dr. Pahlevani never complained to

---

[20] The non-moving plaintiff's response indicates that she disputes this factual statement, but her answer to this fact statement is non-responsive, stating only that University officials had some difficulty confirming the accuracy of her performance evaluation ratings when they compiled them in connection with an August 2019 inquiry into Dr. Pahlevani's concerns about her salary. Thus, the moving defendant's statement is deemed admitted.

Chancellor Sandler about the performance scores she was given during her P&T review years.

A professor who receives a positive second year P&T review is recommended to continue on the tenure track and remains eligible for promotion. Similarly, a professor who receives a positive fourth year P&T review is recommended to continue on the tenure track and remains eligible for promotion. Finally, a professor who receives a positive sixth year P&T review is promoted from Assistant Professor to Associate Professor.

Both Dr. Pahelvani and Dr. Fury were promoted to Associate Professor in 2016.

After certain standards have been met, Associate Professors become eligible to apply for promotion to Full Professor. Eligible Associate Professors who are successful in the final P&T review process are promoted to Full Professor.

The moving defendants have provided comparative information regarding Dr. Pahlevani's and Dr. Fury's performance scores over the ten-year period between 2011 and 2021.

In 2011, Dr. Pahlevani received annual performance review scores

of 3 (teaching), 3.5 (research), and 4 (service) for an overall score of 3.5; Dr. Fury received scores of 5 (teaching), 5 (research), and 4 (service) for an overall score of 5.[21]

In 2012, Dr. Pahlevani received P&T review scores of 3 (teaching), 3 (research), and 3 (service), and she was recommended to continue on tenure track; Dr. Fury received scores of 5 (teaching), 3.5 (research), and 4 (service, and he was recommended to continue on tenure track.[22]

In 2014, Dr. Pahlevani received P&T review scores of 3.5 (teaching), 3 (research), and 4 (service), and she was recommended to continue on tenure track; Dr. Fury received scores of 5 (teaching), 4 (research), and 5 (service), and he was recommended to continue on tenure track.[23]

In 2015, Dr. Pahlevani received annual performance review scores of 4 (teaching), 3 (research), and 5 (service) for an overall score of 4; Dr. Fury received scores of 5 (teaching), 5 (research), and 5 (service) for an overall score of 5.[24]

In 2016, Dr. Pahlevani received P&T review scores of 4 (teaching),

---

[21] *See supra* note 8.
[22] *See supra* note 8.
[23] *See supra* note 8.
[24] *See supra* note 8.

5 (research), and 5 (service), and she was promoted to Associate Professor; Dr. Fury received scores of 5 (teaching), 5 (research), and 5 (service), and he was promoted to Associate Professor.[25]

In 2017, Dr. Pahlevani received annual performance review scores of 3.5 (teaching), 3 (research), and 5 (service) for an overall score of 3.5; Dr. Fury received scores of 5 (teaching), 4.5 (research), and 4 (service) for an overall score of 4.5.[26]

In 2018, Dr. Pahlevani received annual performance review scores of 4.5 (teaching), 4 (research), and 4.5 (service) for an overall score of 4.5; Dr. Fury received scores of 5 (teaching), 4 (research), and 5 (service) for an overall score of 4.5.[27]

In 2019, Dr. Pahlevani received annual performance review scores of 4 (teaching), 3 (research), and 3 (service) for an overall score of 3.5; Dr. Fury received scores of 5 (teaching), 5 (research), and 5 (service) for an overall score of 5.[28]

In 2020, Dr. Pahlevani received annual performance review scores

---

[25] *See supra* note 8.
[26] *See supra* note 8.
[27] *See supra* note 8.
[28] *See supra* note 8.

of 4 (teaching), 5 (research), and 4 (service) for an overall score of 4.5; Dr. Fury received scores of 5 (teaching), 5 (research), and 5 (service) for an overall score of 5.[29]

In 2021–2022, Dr. Pahlevani received P&T review scores 4 (teaching), 4.5 (research), and 4 (service), and she was promoted to Full Professor; Dr. Fury received scores of 5 (teaching), 3 (research), and 5 (service), and he was promoted to Full Professor.

Dr. Fury earned the highest possible teaching rating of 5 (excellent) each and every time his performance was reviewed.[30] Professor teaching scores are the most critical scores in the general salary increase process, as they are weighted at 60% of the overall score.[31] One of Dr. Pahlevani's and Dr. Fury's Division Heads, Dr. Hatahet, testified at his deposition that Dr. Fury was a "very good teacher" with student evaluations that were "consistently some of the best in the division," whereas Dr. Pahlevani was "good" but "not as engaging as Dr. Fury," and her student evaluations were not as good as Dr. Fury's.[32] Dr. Pahlevani never earned

---

[29] *See supra* note 8.
[30] *See supra* note 8.
[31] *See supra* note 8.
[32] *See supra* note 8.

the highest possible teaching rating of 5 at any point between 2011 and 2021.[33]

The general salary increase ("GSI") process is a multi-step process. If the Penn State Board of Trustees determines that there is sufficient funding to provide merit-based annual salary increases for faculty in a particular year, information is provided to the Chancellor of Penn State Abington about the funds available (the "allocated funds") for distribution to professors in the form of salary increases, which are generally based on the professor's annual performance review scores.[34]

When funds are made available for increases, a letter from the President of Penn State regarding the GSI plan is provided to the Chancellor, Financial Officer, and HR Strategic Partner of Penn State Abington, along with guidelines for most effectively administering the merit increase funds.[35] These guidelines provide a suggested range of

---

[33] *See supra* note 10.

[34] The non-moving plaintiff's response indicates that she disputes this factual statement, but her answer to this fact statement is non-responsive, stating only that other factors—such as market considerations and equity (or fairness)—have been considered and used at times. Thus, the moving defendant's statement of fact is deemed admitted.

[35] *See supra* note 34.

increases for employees who are *meeting* expectations during that particular year.[36] Penn State Abington has also been instructed to use the GSI process as an opportunity to recognize excellence beyond just meeting expectations by providing higher percentage merit increases to employees whose performance consistently *exceeds* the performance standards for their positions.[37] Penn State has reiterated to Penn State Abington that it is committed to awarding salary increases principally on the basis of performance as determined by annual evaluations, and it charged Penn State Abington with distributing the allocated funds for professor salary increases in accordance with that commitment.[38]

As part of the GSI process, and in accordance with Penn State's instructions and guidance, Penn State Abington's Financial Officer or HR Strategic Partner completed a draft worksheet to distribute the allocated funds to professors based on their overall annual performance review scores (the "GSI worksheet").[39] The GSI worksheet, containing all of the current faculty salaries, is sent from Penn State's HR department in

---

[36] *See supra* note 34.
[37] *See supra* note 34.
[38] *See supra* note 34.
[39] *See supra* note 34.

University Park to Penn State Abington's Financial Officer or HR Strategic Partner for their use in the GSI process.[40]

Penn State Abington's Financial Officer or HR Strategic Partner also receives a report, either directly from the Division Heads or from the Vice Chancellor, of the evaluation scores for each faculty member.[41] Each of these scores, which range from 1 to 5, is assigned a percentage based on the allocated funds designated to Penn State Abington for faculty salary increases.[42] Penn State Abington's Financial Officer uses the lump-sum budget for faculty increases, which was received from Penn State's HR in University Park, to determine which percentage increase will be allocated for each level of evaluation score given to a faculty member.[43] That percentage is then added to the spreadsheet and is used to determine each faculty member's merit increase for that evaluation year.[44] All of these percentage increases are then tallied to ensure that Penn State Abington comes to a balanced amount, meeting the budget

---

[40] *See supra* note 34.
[41] *See supra* note 34.
[42] *See supra* note 34.
[43] *See supra* note 34.
[44] *See supra* note 34.

that was allocated from University Park.[45]

When Penn State has funds available to provide a salary increase for professors, those salary increases are directly tied to the evaluation scores the professors received that year.[46] Professors who are performing better (i.e., those with higher overall performance evaluation scores) receive higher merit-based increases than professors who are not performing as well (i.e., those with lower overall scores).[47]

Between 2016 and 2019, Dr. Pahlevani received merit-based increases that were at least within the "meeting expectations" range for each year.[48] In 2016 and 2018, Dr. Pahlevani's merit-based inreases exceeded the "meeting expectations" range for those years.[49]

Penn State Abington also occasionally provides "equity" adjustments to compensation, which are increases in professor salaries to address compression among salaries due to shifts in the market.[50] For example, when the salary of a faculty member is adjusted because a new

---

[45] *See supra* note 34.
[46] *See supra* note 34.
[47] *See supra* note 34.
[48] *See supra* note 34.
[49] *See supra* note 34.
[50] *See supra* note 34.

hire was brought into the same department at a higher salary due to market conditions, or when there is a rapid shift in a particular academic field (e.g., computer science) which requires an adjustment of salaries to retain current faculty under the pressure of market competition outside Penn State Abington.[51]

Upon reviewing the initially assigned salary increases, Chancellors have the discretion to recommend such an equity adjustment.[52] Penn State Abington does not make equity adjustments to a faculty member's salary unless the faculty member has evaluation scores that meet expectations; the equity adjustment is not based on the faculty member's sex, religion, or national origin.[53]

In January 2012, Penn State increased both Dr. Pahlevani's and Dr. Fury's salaries to $60,003 to address the "equity" or market position of mathematics professors in the Math Department.[54] In September 2012,

---

[51] *See supra* note 34.

[52] *See supra* note 34.

[53] *See supra* note 34.

[54] The non-moving plaintiff has admitted this statement in part and denied it in part. She appears to have admitted that salaries for both professors were increased to $60,003. But she has qualified that admission with an additional observation that Dr. Fury's salary increased more than Dr. Pahlevani's to reach that point. She provides

*(continued on next page)*

Penn State Abington provided a merit increase to Dr. Pahlevani as part of the typical GSI process, bringing her total salary to \$62,190. Dr. Fury's salary was similarly increased.[55]

Between 2013 and 2019, Penn State Abington provided additional salary increases to Dr. Pahlevani and Dr. Fury.[56]

Fall 2018 and Spring 2019, Dr. Pahlevani took a sabbatical leave of absence, in accordance with Penn State's Sabbatical Policy, AC17, and she was compensated, in accordance with Penn State policy, at 67% of her base salary for that academic year.

In 2020, during the COVID-19 pandemic, Penn State Abington was not given any funds to provide salary increases for professors as part of

---

additional non-responsive commentary as well, which we have disregarded. *See supra* note 4.

[55] The moving defendant's state of material facts has attributed Dr. Fury's increase to the typical GSI process as well, but as the non-moving plaintiff has pointed out, the evidence cited in support does not specifically indicate *why* his salary was increased at this time.

[56] The non-moving plaintiff has admitted the moving defendant's statement in part and denied it in part. She has admitted that both professors received salary increases, and she has pointed out that the evidence cited in support does not specifically indicate *why* Dr. Pahlevani's or Dr. Fury's salary was increased at these times. *See supra* note 55. She provides additional non-responsive commentary as well, which we have disregarded. *See supra* note 4.

the GSI process.[57]

In 2021, Penn State Abington provided salary increases to both Dr. Pahlevani and Dr. Fury.[58]

In August 2021, Dr. Fury was promoted to Interim Division Head for Science and Engineering, at which point he was predominantly engaged in administration, he was no longer engaged in full-time teaching, and he was no longer considered for merit-based increases in the same way as Dr. Pahlevani.[59]

---

[57] The non-moving plaintiff has admitted the moving defendant's statement in part and denied it in part. She has admitted that neither Dr. Pahlevani nor Dr. Fury received a salary increase in 2020. But she further comments that Dr. Fury's salary remained $7,992 higher than Dr. Pahlevani's salary, citing to documents produced by the defendant.

[58] The non-moving plaintiff has indicated that this factual statement by the moving defendant is disputed, but the evidence she has cited is consistent with the moving defendant's statement that both professors received a salary increase, although, as the non-moving plaintiff has pointed out, the evidence cited in support does not specifically indicate *why* their salaries were increased at this time. The non-moving plaintiff further comments that Dr. Fury's salary was now $8,856 higher than Dr. Pahlevani's salary, citing to documents produced by the defendant.

[59] The non-moving plaintiff has indicated that this factual statement by the moving defendant is disputed, but the evidence she has cited is not inconsistent with the moving defendant's statement. Thus, the moving defendant's statement of fact is deemed admitted. The non-moving plaintiff further comments that Dr. Fury's based salary in 2021 was $8,856 higher than Dr. Pahlevani's salary, citing to documents produced by the defendant.

Between 2011 and 2015, Dr. Fury received higher merits-based increases than Dr. Pahlevani because he earned higher annual performance and P&T review scores than Dr. Pahlevani.[60]

The moving defendants have provided comparative information regarding Dr. Pahlevani's and Dr. Fury's salaries over the twelve-year period between 2010 and 2022. In August 2010, Dr. Pahlevani's initial salary was $55,008, and Dr. Fury's initial salary was $52,506.[61] In January 2012, both professors' salaries were increased to $60,003.[62] In September 2012, Dr. Pahlevani's salary was increased to $62,190, and Dr. Fury's salary was increased to $62,829.[63] In October 2013, Dr. Pahlevani's salary was increased to $64,080, and Dr. Fury's salary was increased to $67,410.[64] In October 2014, Dr. Pahlevani's salary was increased to $66,042, and Dr. Fury's salary was increased to $70,056.[65] In July 2015, Dr. Pahlevani's salary was increased to $67,482, and Dr. Fury's salary was increased to $73,971.[66] In July 2016, after being

---

[60] *See supra* note 4.
[61] *See supra* note 4.
[62] *See supra* note 4.
[63] *See supra* note 4.
[64] *See supra* note 4.
[65] *See supra* note 4.
[66] *See supra* note 4.

promoted to Associate Professor, Dr. Pahlevani's salary was increased to $74,322, and Dr. Fury's salary was increased to $80,811.[67] In October 2016, Dr. Pahlevani's salary was increased to $76,761, and Dr. Fury's salary was increased to $82,413.[68] In July 2017, Dr. Pahlevani's salary was increased to $77,805, and Dr. Fury's salary was increased to $83,844.[69] In July 2018, Dr. Pahlevani's salary was increased to $79,362, and Dr. Fury's salary was increased to $86,148.[70] In July 2019, Dr. Pahlevani's salary was increased to $80,964, and Dr. Fury's salary was increased to $88,956.[71] In July 2021, Dr. Pahlevani's salary was increased to $83,196, and Dr. Fury's salary was increased to $92,052.[72] In July 2022, after being promoted to Full Professor, Dr. Pahlevani's salary was increased to $95,220, but Dr. Fury no longer remained a similarly situated comparator due to his promotion to an administrative position.[73]

Dr. Tepper currently works as an Associate Professor of Mathematics and Program Chair for the Mathematics Department. He

---

[67] *See supra* note 4.
[68] *See supra* note 4.
[69] *See supra* note 4.
[70] *See supra* note 4.
[71] *See supra* note 4.
[72] *See supra* note 4.
[73] *See supra* note 4.

has not been promoted to Full Professor. Although Dr. Tepper earned a higher salary than Dr. Pahlevani between 2017 and 2021, when both were Associate Professors, Dr. Pahlevani has earned a higher annual salary than Dr. Tepper since July 1, 2022.

In May 2016, Dr. Pahlevani learned that Dr. Fury was paid more than she was, and she also learned Dr. Tepper's salary range. Dr. Pahlevani is of the opinion that she and Dr. Fury should have been set at the same salary because they were both promoted to Associate Professor in the same academic year, notwithstanding their respective performance evaluation scores, as both were qualified for the job and both performed satisfactorily.

Dr. Pahlevani never made any complaints to Chancellor Sandler about her annual performance review scores or her P&T review scores received between 2010 and 2016. A few months after she learned in May 2016 that Dr. Fury was paid a higher salary than her, Dr. Pahlevani brought the issue to the attention of Chancellor Sandler. But Chancellor Sandler retired only a few days later, working her last day before retirement on July 1, 2016.

On July 30, 2016, Dr. Pahlevani contacted the new Chancellor, Dr.

Fernandez, with questions regarding her salary. Dr. Fernandez worked with Vice Chancellor August and Mr. Meuleners to investigate Dr. Pahlevani's complaint and review Dr. Pahlevani's historical performance documentation and salary increase. Dr. Fernandez observed that Dr. Pahlevani under-performed compared to the evaluations of her peers.[74] Finding that Dr. Pahlevani's salary was properly based on her historical performance, and that merit increases were awarded to her based on that performance, Dr. Fernandez determined that no further modification to her salary was warranted.[75] On August 15, 2016, Dr. Fernandez met with Dr. Pahlevani to explain the GSI process, and he confirmed that her salary would only be reviewed in accordance with the regular, annual GSI process. Thus, in 2016, Dr. Pahlevani was aware that Penn State did not plan to increase her salary to make it equal to Dr. Fury's or Dr. Tepper's salaries, but she did not file an administrative charge of discrimination or a legal complaint at that time.

On February 8, 2017, Dr. Pahlevani met with then-HR Strategic Partner Lisa Marranzini to again raise a complaint about her

---

[74] *See supra* note 4.
[75] *See supra* note 4.

compensation. Ms. Marranzini acknowledged Dr. Pahlevani's complaint about her salary by explaining, if an equity issue exists that warrants correction, she would consult with the Chancellor and the Finance Officer to determine next steps.[76] But when Dr. Pahlevani's historical evaluation scores were reviewed, it was determined that no equity issues existed.[77] After completing her investigation, Ms. Marranzini spoke with Dr. Pahlevani to educate her about the instances when pay changes may occur, and she explained that pay decisions are based on professor performance.[78]

Dr. Pahlevani had also complained to Ms. Marranzini about alleged mistreatment and discrimination in her interactions with her Division Head and Program Chair, and in connection with her profile on Penn State Abington's website. With respect to these discrimination complaints, Ms. Marranzini referred Dr. Pahlevani to Penn State's Affirmative Action Office ("AAO"). Dr. Pahlevani never contacted Penn State's AAO.

In August 2019, Dr. Pahlevani sent an email to Dr. Fernandez to

---

[76] *See supra* note 4.

[77] *See supra* note 4.

[78] *See supra* note 4.

complain about her 2019 salary. Dr. Fernandez conducted another investigation and reviewed Dr. Pahlevani's historical performance documentation and the salary increase given to her in 2019.[79] Dr. Fernandez again determined that any difference between Dr. Pahlevani's salary and her peers was correlated with her performance review scores being lower than her peers' performance review scores.

On June 12, 2019, Dr. Pahlevani had requested and received a copy of her personnel file to review. On October 13, 2019, Dr. Pahlevani confirmed in an email message to Dr. Fernandez that she found her performance ratings and salary increases during his tenure as Chancellor to be fair. But Dr. Pahlevani has maintained her position that her performance evaluations should not have impacted her salary, and that she should have been paid the same as her male colleagues in the same position.

In January 2021, within a few days after Dr. Dellicarpini began her

---

[79] *See supra* note 4. The non-moving plaintiff also cites to an email exchange between Chancellor Fernandez, Vice Chancellor August, and HR Strategic Partner Marranzini discussing the investigation and response to Dr. Pahlevani's email complaint, but the evidence cited is consistent with this fact statement by the moving defendant. Thus, the moving defendant's statement of fact is deemed admitted.

work as Chancellor of Penn State Abington, Dr. Pahlevani contacted her to request a review of her salary. In response, Dr. Dellicarpini conducted an investigation, which included requesting and reviewing any data relevant to Dr. Pahlevani's evaluation scores and salary increases.[80] Ultimately, Dr. Dellicarpini determined that any difference in pay between Dr. Pahlevani and white male faculty members in the Math Department was a direct result of their respective merit scores and merit evaluations.[81] On March 16, 2021, Dr. Dellicarpni advised Dr. Pahlevani by email that she had concluded her investigation and determined that Dr. Pahlevani's "starting salary was equitable and aligned with other incoming faculty in the discipline at Abington," and that "[a]ny variance in compensation now is a result of performance reviews and the award of merit increases over the years."

On or about July 21, 2022, counsel representing Dr. Pahlevani sent

---

[80] The non-moving plaintiff's response indicates that she disputes this factual statement, but her answer to this fact statement is non-responsive, stating only that it mischaracterizes events that occurred and the alleged efforts by others at Penn State Abington to keep her salary lower than her male colleagues. In support, the non-moving plaintiff cites evidence that is not inconsistent with the moving defendant's statement. Thus, the moving defendant's statement of fact is deemed admitted.

[81] *See supra* note 80.

letters to Penn State's Vice President and General Counsel and to Mr. Meuleners seeking to resolve issues with her salary without the need for litigation. She then dual-filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") on October 31, 2022, alleging compensation-related discrimination based on her sex and national origin. After receiving a right-to-sue notice from the EEOC, Dr. Pahlevani initiated this litigation by filing her complaint in this federal civil action on July 18, 2023.

## III.   DISCUSSION

### A. Potential Waiver by the Defendant of Statute of Limitations and Failure to Exhaust Administrative Remedies Defenses

The defendant has interposed statute of limitations and failure to exhaust administrative remedies defenses. It contends that part or all of each of the plaintiff's discrimination claims is barred as untimely filed or for failure to exhaust administrative remedies.

The plaintiff has responded by arguing that the defendant waived any such affirmative defenses by failing to include them in its original answer to the complaint. She contends that, because the defendant's amended answer was filed after the deadline for amending pleadings

established by a case management order and *without* leave of court, it should be stricken.

The plaintiff dual-filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") on October 31, 2022, alleging compensation-related discrimination based on her sex and national origin. On June 20, 2023, the EEOC issued her a right-to-sue letter.

The plaintiff commenced this civil action by filing her complaint in this federal district court on July 18, 2023. Doc. 1. The defendant waived formal service of process and timely filed its original answer to the complaint on September 18, 2023. Doc. 8. While that original answer set forth several affirmative defenses to the plaintiff's claims, it did not assert an affirmative defense under the applicable statutes of limitations or for failure to exhaust administrative remedies. *Id.*

On October 26, 2023, counsel for the parties appeared before the court for a case management conference. Following that conference, the court entered a Rule 16 case management order, which included a December 15, 2023, deadline for the defendant to amend its pleadings.

Doc. 13 ¶ 2. By separate order, the case was referred for mandatory mediation before a court-appointed mediator. Doc. 14.

On February 21, 2024, the parties filed a joint motion for a 60-day extension of pretrial deadlines established by the case management order. Doc. 17. The joint motion indicated that the parties had not yet been able to schedule their mediation session with the court-appointed mediator. *Id.* The parties' proposed order extended fact discovery and dispositive motions deadlines by approximately 60 days each, and it cancelled all other pretrial deadlines. *Id.* Later that same day, the court endorsed and entered the proposed order. Doc. 18.

On April 23, 2024, the court-appointed mediator reported that the parties had been unable to reach a settlement. Doc. 19.

Three days later, on April 26, 2024, the defendant filed its amended answer, with written consent from the plaintiff. Doc. 21. The amended answer was substantially identical to the defendant's original answer, except for the addition of several new affirmative defenses. *Compare* Doc. 21, *with* Doc. 8. Among these new additions was the defendant's fourteenth affirmative defense, which now asserted that "Plaintiff's claims are barred, in whole or in part, by the applicable statute of

limitations and/or her failure to exhaust all administrative remedies." Doc. 21, at 10.

After the amended answer was filed, the plaintiff raised no objections to it, nor did she promptly move to strike the amended answer as untimely filed. The parties proceeded with discovery and another round of mediation, this time before a United States magistrate judge.

On August 25, 2025, the defendant timely filed its motion for summary judgment, which relied extensively on its statute of limitations and failure to exhaust administrative remedies affirmative defenses. Doc. 40. On September 8, 2025, the defendant timely filed its brief in support of the motion for summary judgment, which again relied extensively on its statute of limitations and failure to exhaust administrative remedies affirmative defenses. Doc. 42 (sealed).

On October 1, 2025, the plaintiff timely filed her brief in opposition to the motion for summary judgment. Doc. 52 (sealed). In her opposition brief, the plaintiff argued for the first time that the defendant had waived its statute of limitations and failure to exhaust administrative remedies defenses, and that the amended answer should be stricken from the record because it failed to comply with the requirements of Fed. R. Civ.

P. 16(b)(4).[82]

On October 17, 2025, the defendant timely filed its reply brief. Doc. 56 (sealed).

Generally, amended pleadings are governed by Fed. R. Civ. P. 15. A party has a right to amend its pleading once as a matter of course within 21 days after serving it, or 21 days after a responsive pleading or a motion under Fed. R. Civ. P. 12(b), (e), or (f) is filed. Fed. R. Civ. P. 15(a)(1). After that right has been exercised once, or the time for doing so has expired, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2).

But "when a party moves to amend or add a party after the deadline in a district court's scheduling order has passed, the 'good cause' standard of Rule 16(b)(4) of the Federal Rules of Civil Procedure applies. A party must meet this standard before a district court considers whether the party also meets Rule 15(a)'s more liberal standard." *Premier Comp Sols., LLC v. UPMC*, 970 F.3d 316, 319 (3d Cir. 2020); *see also* Fed. R. Civ. P. 16(b)(3) (requiring the court to enter a scheduling order in each civil case,

---

[82] The plaintiff, however, has at no point filed a motion to strike the amended answer.

- 42 -

which "must limit the time to . . . amend the pleadings"); Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."); *Suppertime, LLC v. Frankfield Mgmt., LLC*, 790 F. Supp. 3d 466, 473 (D.V.I. 2025) (quoting *Premier Comp Sols.*); *Henkel v. Highgate Hotels, LP*, No. 3:15-CV-01435, 2022 WL 23029027, at *2 (M.D. Pa. Aug. 16, 2022) (citing *Premier Comp Sols.*).

"[W]hether 'good cause' exists under Rule 16(b)(4) depends in part on [the amending party's] diligence." *Premier Comp Sols.*, 970 F.3d at 319; *see also Suppertime*, 790 F. Supp. 3d at 473 (quoting *Premier Comp Sols.*); *Henkel*, 2022 WL 23029027, at *2 (same). "Thus, where a movant fails to meet its burden under Rule 16(b)(4) to show that, despite its diligence, it could not meet the court's scheduling order, the court need not determine whether the movant meets Rule 15(a)'s requirements." *Suppertime*, 790 F. Supp. 3d at 473; *Henkel*, 2022 WL 23029027, at *2 ("Thus, leave to amend is properly denied under Rule 16 when the moving party has failed to establish due diligence."). "[T]he focus of a Rule 16 analysis is the moving party's diligence and not prejudice to the non-moving party." *Faiella v. Sunbelt Rentals, Inc.*, 341 F.R.D. 553, 559 (D.N.J. 2022). "Good cause may also be satisfied if the movant shows that

- 43 -

the inability to comply with a scheduling order is 'due to any mistake, excusable neglect or any other factor which might understandably account for failure of counsel to undertake to comply with the Scheduling Order.'" *Id.* (quoting another source). Extending case management deadlines to accommodate a settlement conference that may facilitate resolution of the case and thereby conserve party and judicial resources may also, in the discretion of the court, constitute good cause for modification of a scheduling order. *See Panchenko v. Bank of Am., N.A.,* No. 23-cv-04965, 2025 WL 4481077, at *2 (N.D. Cal. Apr. 28, 2025); *see also Vollmer v. United Seating & Mobility, LLC*, No. 5:20-CV-05082, 2023 WL 7181704, at *3 (D.S.D. July 19, 2023) (acknowledging "the possibility that mediation could constitute good cause in some circumstances"); *Frederick v. Avantix Labs., Inc.*, 773 F. Supp. 2d 446, 451 (D. Del. 2011) (finding "sufficient diligence" where the parties had been interested in attempting mediation, and the party seeking modification had continued to seek discovery in the interim).

Here, the plaintiff provided written consent to the defendant's amendment, but that does not absolve the defendant of its obligation to demonstrate good cause under Rule 16. *See Laster v. Rankin Cnty. Sch.*

- 44 -

*Dist.*, No. 3:24-CV-20, 2024 WL 3296946, at \*1 (S.D. Miss. July 3, 2024) ("The party seeking untimely leave to amend bears the burden of demonstrating good cause, and neither consent nor absence of opposition obviates the need to satisfy Rule 16(b)(4) and its applicable factors."). But under the circumstances presented, we find that the defendant has demonstrated good cause for modification of the scheduling order to accommodate the filing of its amended answer. As the parties contemporaneous filings indicate, the parties continued to diligently seek discovery while also pursuing an early-stage resolution of this case through mediation, and the defendant promptly filed its amended answer with the plaintiff's written consent within three days after that mediation effort ended unsuccessfully.

The defendant having satisfied the "good cause" requirement of Rule 16(b)(4), we turn then to the more liberal requirements of Rule 15(a)(2). Under that rule, leave of court was not required because the defendant had plaintiff's written consent, which it then filed on the record as an attachment to its amended complaint. *See* Doc. 21. *See generally* Fed. R. Civ. P. 15(a)(2).

Accordingly, we decline to strike the amended answer as untimely

filed under the circumstances presented. We find that the defendant has demonstrated good cause to modify the scheduling order, satisfying the requirements of Fed. R. Civ. P. 16(b)(4), and that it filed the amended answer with the written consent of the plaintiff, satisfying the requirements of Fed. R. Civ. P. 15(a)(2). Thus, the defendant's statute of limitations and failure to exhaust administrative remedies affirmative defenses have not been waived.

### B. Equal Pay Act Claim

In Count I, Dr. Pahlevani brings a discriminatory pay claim, claiming that she was paid less than a male counterpart for equivalent work, in violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d).

In evaluating an Equal Pay Act claim, "[t]he court applies a two-step burden-shifting test to its analysis." *Johnson v. Fed. Express Corp.*, 996 F. Supp. 2d 302, 319–20 (M.D. Pa. 2014). First, "[a] plaintiff establishes a *prima facie* case by showing that employees of the opposite sex were paid differently for performing 'equal work'; that is, work of substantially equal skill, effort and responsibility, under similar working conditions." *E.E.O.C. v. Del. Dep't of Health & Hum. Servs.*, 865 F.2d 1408, 1413–14 (3d Cir. 1989); *see also Summy-Long v. Pa. State Univ.*,

715 Fed. App'x 179, 183 (3d Cir. 2017); *Johnson*, 996 F. Supp. 2d at 320.

> If a plaintiff is able to demonstrate a *prima facie* Equal Pay Act case, the burden then shifts to the employer to show that the pay difference resulted from (1) a *bona fide* seniority system, (2) a merit system, (3) a system that measures earnings by quantity or quality of production, or (4) a differential based on any factor other than sex.

*Summy-Long*, 715 Fed. App'x at 183; *see also E.E.O.C.*, 865 F.2d at 1414; *Johnson*, 996 F. Supp. 2d at 320. On summary judgment, "[t]he defendant must prove its affirmative defense 'so clearly that no rational jury could have found to the contrary.'" *Johnson*, 996 F. Supp. 2d at 320 (quoting *E.E.O.C.*, 865 F.2d at 1414 (affirming district court's post-trial grant of judgment n.o.v.)).

Here, the plaintiff has established a *prima facie* Equal Pay Act case with respect to the period beginning in September 2012, when Dr. Fury's salary first exceeded Dr. Pahlevani's, and ending in July 2021, the last pay period before Dr. Fury's promotion to Interim Department Head, at which point he was no longer a suitable comparator, because he and Dr. Pahlevani were no longer performing work of substantially equal skill, effort and responsibility, under similar working conditions.

With the burden of persuasion then shifting to the employer, the

defendant has raised one of the four statutory affirmative defenses set forth in the Equal Pay Act, contending that the difference in payment between opposite sexes in this case is permissible because it was made pursuant to a merit system. But based on the record before the court, viewed in the light most favorable to the non-moving plaintiff, we are unable to conclude that it has proven this affirmative defense so clearly that no rational jury could find to the contrary.

In addition, the defendant has raised the Equal Pay Act's statute of limitations as an affirmative defense.

The statute of limitations for an Equal Pay Act violation is two years, unless the violation is shown to be willful, in which case it is three years. 29 U.S.C. § 255(a); *Schengrund v. Pa. State Univ.*, 705 F. Supp. 2d 425, 440 (M.D. Pa. 2009). A violation may only be considered "willful" if the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited" by the Equal Pay Act. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 130 (1988); *Stone v. Troy Constr., LLC*, 935 F.3d 141, 148 (3d Cir. 2019) (quoting *McLaughlin*). "A plaintiff need not show that an employer acted with intent to discriminate or in bad faith." *Pollis v. New Sch. for Social Res.*, 132 F.3d 115, 119 (2d Cir. 1997)

(citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 126 n.19 (1985)).

"[A]n Equal Pay Act claim accrues each time a discriminatory paycheck is issued and . . . each discriminatory paycheck is considered a discrete act rather than an incident of a continuing violation." *Metzinger v. United States*, 173 Fed. Cl. 636, 647 (2024); *see also Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ.*, 579 F.3d 546, 553 (5th Cir. 2009) (holding that university professor's Equal Pay Act claim accrued, for limitations purposes, when she received her last paycheck from her state university employer); *Gandy v. Sullivan Cnty.*, 24 F.3d 861, 864 (6th Cir. 1994) ("The Equal Pay Act is violated each time an employer presents an 'unequal' paycheck to an employee for equal work. . . . [E]ach check paid at the discriminatory rate is a denial of equal pay and a separate violation of the Act."); *Schengrund*, 705 F. Supp. 2d at 440 ("[U]nder the EPA each paycheck issued to the [female] Professors at a lower pay rate than that received by their male colleagues constitutes a new discriminatory action for purposes of EPA accrual.").

This action was commenced on July 18, 2023. If willful, any Equal Pay Act violation that occurred prior to July 18, 2020, is barred by the

applicable statute of limitations. If willfulness is not shown, any violation that occurred prior to July 18, 2021, is barred. Moreover, because Dr. Fury was promoted into an administrative position on August 16, 2021, the latest violation for which Dr. Pahlevani has established a *prima facie* case is her July 2021 end-of-month paycheck.

We find that the non-moving plaintiff has adduced sufficient evidence to demonstrate a genuine dispute of material fact with respect to whether any Equal Pay Act violation was willful. In particular, the evidence adduced indicates that, on multiple occasions over several years, Dr. Pahlevani complained to decisionmakers at Penn State Abington about discrepancies between her salary and the salaries of her male colleagues. Those decisionmakers investigated and responded to her complaints, demonstrating the defendant's awareness of this potential Equal Pay Act violation, but they did not rectify the discrepancy, continuing to pay Dr. Pahlevani less than her male colleague, Dr. Fury, until he became a University administrator in August 2021. Viewing these facts in the light most favorable to the non-moving plaintiff, Dr. Pahlevani, we are unable to conclude that no reasonable jury could find that the defendant's conduct was willful or

reckless. *See Pollis*, 132 F.3d at 119–20.

Accordingly, finding genuine disputes of material fact exist with respect to the non-moving plaintiff's Equal Pay Act claims for her monthly paychecks received between July 2020 and July 2021, and with respect to the defendant employer's affirmative defense that any pay discrepancy was based on a merit system, we will grant summary judgment in favor of the defendant with respect to the plaintiff's Equal Pay Act claims, set forth in Count I of the complaint, to the extent they concern monthly paychecks received *before* July 18, 2020, or *after* August 16, 2021. The plaintiff's Equal Pay Act claims concerning monthly paychecks received between July 18, 2020, and August 16, 2021, will be set down for trial.

### C. Section 1981 Race Discrimination Claim

In Count II, Dr. Pahlevani brings a racial discrimination claim, claiming that she was paid less than a Caucasian counterpart on the basis of her Middle-Eastern Iranian race, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

We analyze the plaintiff's pay-related § 1981 race discrimination claims under the familiar burden-shifting framework set forth in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Tucker v. Thomas Jefferson Univ.*, 484 Fed. App'x 710, 712 (3d Cir. 2012); *Johnson*, 996 F. Supp. 2d at 316. As summarized by the Supreme Court of the United States:

> Under *McDonnell Douglas*, a plaintiff must first establish a prima face case of discrimination. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual.

*Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n.3 (2003) (citations omitted).

To establish a *prima facie* case of race discrimination under § 1981, a plaintiff must establish that he or she: (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of racial discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *Tucker*, 484 Fed. App'x at 712; *Johnson*, 996 F. Supp. 2d at 316.

Here, the defendant argues that Dr. Pahlevani has failed to demonstrate a cognizable adverse employment action. But as this court

has previously recognized, "paying an individual a lower salary for discriminatory reasons can be an adverse employment action." *Johnson*, 996 F. Supp. 2d at 317. In their briefs, the defendants argue that Dr. Pahlevani was paid less than Dr. Fury because of her annual performance review and P&T review scores, not because of her race. But viewing the evidence of record in the light most favorable to the non-moving plaintiff, we find that Dr. Pahlevani has adduced sufficient evidence to demonstrate a genuine dispute of material fact with respect to whether she suffered an adverse employment action. *See id.*

Similarly, the defendant argues that Dr. Pahlevani has failed to present sufficient evidence to support an inference of unlawful discrimination. But as this court has previously recognized, "[a]n inference of racial discrimination may arise when 'similarly situated persons who are not members of a protected class are treated more favorably.'" *Id.* (quoting *Kimble v. Morgan Props.*, 241 Fed. App'x 895, 898 (3d Cir. 2007) (brackets omitted)). Viewing the evidence in the light most favorable to the non-moving plaintiff, we find that Dr. Pahlevani has adduced sufficient evidence for a reasonable jury to infer racial discrimination. *See id.* at 318.

The defendant employer has clearly satisfied its "relatively light" burden to articulate a legitimate, nondiscriminatory reason for the pay differential at issue here—its merit system for determining salary increases based on annual performance review and P&T review scores.

Finally, the defendant argues that Dr. Pahlevani has failed to adduce sufficient evidence of pretext. It highlights many details of the University's merit-system for determining salary increases we have discussed above, characterizing the merit-system as "objective." But, as the plaintiff has pointed out in her papers, repeatedly, the basis for the numerical performance scores, from which all salary increases were then almost-mechanically derived, is entirely subjective. As courts of this circuit have recognized, reliance on such subjective criteria can be suggestive of pretext. *See, e.g., Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) ("[L]ow evaluation scores may be a pretext for discrimination, especially where, as here, an employer uses subjective criteria . . . to rate its employees."); *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 320 (3d Cir. 2000) ("[T]he Matrix criteria and their weighting are themselves highly subjective even though they are given an apparently objective numerical ranking. . . . Moreover, 'subjective'

- 54 -

scoring is sometimes based upon factors that are too speculative to base a meaningful comparison."); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990) ("[S]ubjective evaluations are more susceptible of abuse and more likely to mask pretext.") (internal quotation marks omitted); *Hanna v. Lincoln Fin. Grp.*, 498 F. Supp. 3d 669, 678 (E.D. Pa. 2020) ("[R]eliance on subjective criteria can be, under certain circumstances, a mask for discrimination.").

Based on the record before us, viewing the evidence in the light most favorable to the non-moving plaintiff, we find that Dr. Pahlevani has adduced sufficient evidence for a reasonable jury to find that the defendant's proffered nondiscriminatory reason for the pay differential at issue here was a pretext for unlawful racial discrimination.

In addition, the defendant has raised the statute of limitations as an affirmative defense to this claim.

A § 1981 claim for race discrimination arising out of workplace discrimination is subject to a four-year limitations period. *See* 28 U.S.C. 1658 (providing a catch-all four-year statute of limitations); *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 372–73 (2004) (holding that employment discrimination claims arising under § 1981(b) are subject to

the four-year catch-all statute of limitations); *Johnson*, 996 F. Supp. 2d at 314. With respect to pay discrimination claims under brought § 1981, "each paycheck issued pursuant to a discriminatory decision is a discrete and complete discriminatory act for which a claim may be brought." *Johnson*, 996 F. Supp. 2d at 316.

As previously noted, this action was commenced on July 18, 2023. Thus, any § 1981 pay discrimination claim based on a paycheck received prior to July 18, 2019, is barred. Moreover, because Dr. Fury was promoted into an administrative position on August 16, 2021, the latest violation for which Dr. Pahlevani has established a *prima facie* case is her July 2021 end-of-month paycheck.

Accordingly, finding genuine disputes of material fact exist with respect to the non-moving plaintiff's pay-related § 1981 race discrimination claims based on her monthly paychecks received between July 2019 and July 2021, we will grant summary judgment in favor of the defendant with respect to the plaintiff's § 1981 race discrimination claims, set forth in Count I of the complaint, to the extent they concern monthly paychecks received *before* July 18, 2019, or *after* August 16, 2021. The plaintiff's § 1981 race discrimination claims concerning

monthly paychecks received between July 18, 2019, and August 16, 2021, will be set down for trial.

### D. Title VII Race, Sex, National Origin Discrimination Claims

In Count III, Dr. Pahlevani brings race, sex, and national origin discrimination claims, claiming that she was paid less than an American-born Caucasian male colleague on the basis of her Iranian birth, Middle-Eastern Iranian race, and female gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5.

The defendant first argues that, with respect to her Title VII claim of race discrimination, Dr. Pahlevani has failed to exhaust her administrative remedies, a prerequisite to suit under Title VII.

"As a precondition for filing suit under Title VII, . . . a plaintiff must exhaust a claim by presenting it in an administrative charge to the [U.S. Equal Employment Opportunity Commission ("EEOC")] . . . ." *Ford-Greene v. NHS, Inc.*, 106 F. Supp. 3d 590, 601 (E.D. Pa. 2015). An employee is not permitted to bypass the administrative process. *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398 (3d Cir. 1976). The "fundamental aim of the pre-suit requirements is to 'give prompt notice to the employer' and 'encourage the prompt processing of all charges of

- 57 -

employment discrimination.'" *Simko v. U.S. Steel Corp.*, 992 F.3d 198, 207 (3d Cir. 2021) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109, 121 (2002)).

"The ensuing suit is limited to claims that are within the scope of the initial administrative charge." *Barzanty v. Verizon PA, Inc.*, 361 Fed. App'x 411, 413–14 (3d Cir. 2010). "A claim has been administratively exhausted when the specifics of a charge with the administrative agency 'fairly encompass a claim' and would put the agency and the defendant employer 'on notice' of that claim." *Ford-Greene*, 106 F. Supp. 3d at 600–01 (quoting *Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir. 1996)). The "relevant test" in the Third Circuit for exhaustion of administrative remedies is "whether the acts alleged in the subsequent . . . suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984); *see also Simko*, 992 F.3d at 207 (quoting *Waiters*, 729 F.2d at 237); *Hewitt v. BS Transp. of Ill., L.L.C.*, 355 F. Supp. 3d 227, 235 (E.D. Pa. 2019). "This determination turns on whether there is a close nexus between the facts supporting each claim or whether additional charges made in the judicial complaint may fairly be considered explanations of the original

charge or growing out of it." *Hewitt*, 35 F. Supp. 3d at 235.

Here, Dr. Pahlevani, acting with the assistance of counsel, dual-filed an administrative charge of discrimination with the EEOC and the PHRC that made no reference whatsoever to any claim of race discrimination. On the charge form, she checked boxes indicating that she alleged discrimination based on "sex" and "national origin" only, failing to check the box marked "race." In relaying the particulars of her claim of discrimination, the charge stated only that she "was born in Iran and is female," that she was "being paid less than a male, American-born co-worker," and that she "believes that the pay inequity and discrimination she has endured is due to her gender and national origin." Doc. 40-1.[83] The parties have cited nothing in the record to suggest that Dr. Pahlevani later amended or supplemented her EEOC charge to add a Title VII race discrimination claim, or that the EEOC investigation expanded to include such a claim within its scope. Thus, without more, we are compelled to agree that the plaintiff failed to exhaust administrative remedies with respect to her Title VII race discrimination

---

[83] The same document can also be found in the defendant's summary judgment exhibits. *See* Def.'s Appx. 276–78, Doc. 42-6 (sealed).

claim. *See Hines v. Vulcan Tools Co.*, 813 Fed. App'x 754, 757 (3d Cir. 2020) (affirming grant of summary judgment for failure to exhaust administrative remedies with respect to racial discrimination claim where employee's EEOC charge alleged only national origin discrimination, and employee never supplemented his EEOC charge with an amendment).

The defendant has also raised the statute of limitations as an affirmative defense to Dr. Pahlevani's Title VII discrimination claims.

"Title VII requires that a claimant file a charge with the EEOC within 300 days of the allegedly discriminatory act." *Hopson v. Dollar Bank*, 994 F. Supp. 332, 336 (W.D. Pa. 1997) (citing 42 U.S.C. § 2000e-5(e)(1)). With respect to Title VII discriminatory compensation cases, each allegedly discriminatory paycheck constitutes an independent, actionable employment practice under Title VII. *See* 42 U.S.C. § 2000e-5(c)(3)(A); *see also Schengrund*, 705 F. Supp. 2d at 432 (quoting the Lilly Ledbetter Fair Pay Act, Pub. L. No. 111-2, § 3, 123 Stat. 5 (2009) (codified at 42 U.S.C. § 2000e-5(c)(3)(A)). In addition, a claimant may recover back pay for up to two years prior to the earliest paycheck received within Title VII's 300-day limitation period. *See* 42 U.S.C. § 2000e-5(c)(3)(B); *see also*

*Schengrund*, 705 F. Supp. 2d at 432–33.

As previously noted, Dr. Pahlevani filed her initial EEOC charge in this case on October 31, 2022. Thus, any Title VII discriminatory compensation claims must be based on a paycheck received on or after January 4, 2022, or her claims are barred by the 300-day statute of limitations. Because Dr. Fury was promoted into an administrative position on August 16, 2021, the latest discriminatory compensation violation for which Dr. Pahlevani has established a *prima facie* case is her July 2021 end-of-month paycheck, which is well outside the 300-day limitation period under Title VII.[84]

Accordingly, based on the undisputed material facts of this case, the moving defendant has demonstrated that it is entitled to judgment as a matter of law with respect to all of the plaintiff's Title VII race, sex, and national origin discrimination claims, set forth in Count III of the complaint.

### E. Title IX Sex Discrimination Claim

In Count IV, Dr. Pahlevani brings a sex discrimination claim,

---

[84] Title VII discrimination claims are analyzed under the same *McDonnell Douglas* burden-shifting framework as § 1981 discrimination claims. *See Qin v. Vertex, Inc.*, 100 F.4th 458, 470 (3d Cir. 2024).

claiming that she was paid less than a similarly situated male colleague on the basis of her gender, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

Title IX discrimination claims are analyzed under the same *McDonnell Douglas* burden-shifting framework as § 1981 and Title VII discrimination claims. *See Middlebrooks v. Univ. of Md.*, 166 F.3d 1209, 1999 WL 7860, at \*4 (4th Cir. 1999) (unpublished table decision) (Title VII, Title IX, and § 1981); *Gunter v. Drexel Univ.*, No. 2:223-cv-02451, 2024 WL 4680032, at \*9 (E.D. Pa. Nov. 5, 2024) (Title VII, Title IX, and § 1981); *Kemether v. Pa. Interscholastic Athletic Ass'n, Inc.*, 15 F. Supp. 2d 740, 755 (E.D. Pa. 1998) (Title VII and Title IX). For the same reasons discussed above in the context of Dr. Pahlevani's § 1981 race discrimination claims, but substituting her gender in place of her race: (1) Dr. Pahlevani has adduced sufficient evidence to establish a *prima facie* case of sex discrimination under Title IX; (2) the defendant employer has clearly met its burden to articulate a legitimate, nondiscriminatory reason for the pay differential at issue here; and (3) Dr. Pahlevani has adduced sufficient evidence for a reasonable jury to find that the defendant's proffered nondiscriminatory reason for the pay differential at

issue here was a pretext for unlawful sex discrimination.

In addition, the defendant has raised the statute of limitations as an affirmative defense to this claim.

A Title IX claim for sex discrimination must be filed within two years of the discriminatory action. *See Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 77–78 (3d. Cir. 1989) (citing *Burnett v. Gratan*, 468 U.S. 42, 51 (1984), and 42 Pa. Cons. Stat. Ann. § 5524); *Schengrund*, 705 F. Supp. 2d 425, 439 (citing *Bougher*). With respect to pay discrimination claims brought under Title IX, "each paycheck received by [the plaintiff] that reflects a discriminatory employment decision constitutes a new, actionable adverse employment action." *Schengrund*, 705 F. Supp. 2d at 440.

As previously noted, this action was commenced on July 18, 2023. Thus, any Title IX sex discrimination claim based on a paycheck received prior to July 18, 2021, is barred. Moreover, because Dr. Fury was promoted into an administrative position on August 16, 2021, the *only* violation for which Dr. Pahlevani has established a *prima facie* case is her July 2021 end-of-month paycheck.

Accordingly, finding genuine disputes of material fact exist with

respect to the non-moving plaintiff's pay-related Title IX sex discrimination claim based on her monthly paycheck received at the end of July 2021, we will grant summary judgment in favor of the defendant with respect to the plaintiff's Title IX sex discrimination claims, set forth in Count IV of the complaint, to the extent they concern monthly paychecks received *before* July 18, 2021, or *after* August 16, 2021. The plaintiff's Title IX sex discrimination claim concerning her monthly paycheck received between July 18, 2021, and August 16, 2021, will be set down for trial.

## IV.    CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment will be granted in part and denied in part. The clerk will be directed to enter judgment in favor of the defendant and against the plaintiff with respect to the plaintiff's: (a) Title VII race, sex, and national origin discrimination claims, set forth in Count III of the complaint; (b) Equal Pay Act sex discrimination claims, set forth in Count I of the complaint, to the extent they concern monthly paychecks received *before* July 18, 2020, or *after* August 16, 2021; (c) Section 1981 race discrimination claims, set forth in Count II of the complaint, to the extent

they concern monthly paychecks received *before* July 18, 2019, or *after* August 16, 2021; and (d) Title IX sex discrimination claims, set forth in Count IV of the complaint, to the extent they concern monthly paychecks received *before* July 18, 2021, or *after* August 16, 2021. The plaintiffs' remaining claims—(a) Equal Pay Act sex discrimination claims, set forth in Count I of the complaint, concerning monthly paychecks received between July 18, 2020, and August 16, 2021; (b) Section 1981 race discrimination claims, set forth in Count II of the complaint, concerning monthly paychecks received between July 18, 2019, and August 16, 2021; and (c) Title IX sex discrimination claims, set forth in Count IV of the complaint, concerning her monthly paycheck received between July 18, 2021, and August 16, 2021—shall be set down for a jury trial.

An appropriate order follows.

Dated: March 31, 2026                    *s/Joseph F. Saporito, Jr.*
                                         JOSEPH F. SAPORITO, JR.
                                         United States District Judge

- 65 -